CHARLES F. MOORE *vs.* HAMILTON A. MOORE.

Suffolk. March 10, 1926. — May 28, 1926.

Present: BRALEY, CROSBY, PIERCE, & WAIT, JJ.

*Equity Jurisdiction,* To set aside conveyance procured by fraud.

A party who has not appealed from a decree in a suit in equity cannot be heard upon contentions as to alleged errors therein harmful to him, when the suit is brought to this court by an appeal of his opponent.

Upon facts found, without a report of evidence, by a master to whom was referred a suit in equity by one brother against another seeking a cancellation of a deed of land executed and delivered to the defendant by their mother, since deceased, it was *held*, that conclusions were warranted that the defendant stood in the highest degree of confidential relationship to the decedent; that, while at the time when the mother executed and delivered the deed she was not insane or mentally incompetent, her mind was not sufficiently alert, owing to her illness, to grasp the legal effect of the deed unless the same was explained to her; that she did not intend to convey said property outright to the defendant, but did intend to arrange for the raising of money thereon; that the details whereby this was to be accomplished did not occupy her attention; that she did not understand at the time of the execution of the deed that she was giving the whole property away without condition

and without consideration; that the defendant knew his mother's state of health and her financial situation, and had reason to know that she understood that the object of the transfer to him was the obtaining of a mortgage on her property for her support and that she did not intend to convey the equity outright; that the acts of the defendant were in fraud of the rights of the decedent; and that a final decree for the plaintiff was warranted.

BILL IN EQUITY, filed in the Superior Court on November 22, 1923, seeking the cancellation of a deed to the defendant from the mother of the plaintiff and the defendant.

In the Superior Court, the suit was referred to a master, who filed two reports as described in the opinion. Material findings by the master are stated in the opinion. The defendant filed objections and exceptions to both reports. The plaintiff filed objections and exceptions to the second report only. The exceptions were heard by *Lawton*, J., by whose order there was entered an interlocutory decree over-ruling the exceptions and a final decree granting relief to the plaintiff upon the basis of an account stated in the master's supplemental report. The defendant appealed.

In this court, the plaintiff made contentions as to an alleged error in law of the master in his second report.

*J. H. Duffy*, for the defendant.

*E. B. Jackson*, for the plaintiff.

PIERCE, J. This is a suit in equity in which the plaintiff and the defendant Moore are brothers, and the sole surviving heirs at law of Mary J. Moore, who died on May 30, 1923.

The bill seeks a cancellation of a deed given to the defendant by Mary J. Moore on March 10, 1922. It alleges that the mother "was not of sufficient mental capacity to understand the effect of said instrument or the circumstances under which it was made and/or brought about and was incapable of making a valid deed; that . . . [the] mother solely intended . . . to thereby procure a fund of money by mortgaging the said premises whereby her extreme wants and needs might be supplied and paid for; that no monetary consideration passed to the mother from the . . . [defendant], Moore, who stood in the highest degree of confidential relationship to his mother, and who likewise stood in a confidential relationship to the . . . [plaintiff]; and that

the mother did not give or intend to give or was not of capacity to give said premises or any equity therein to the . . . [defendant] Moore."

The answer of the defendant, in substance, stated that said deed was a valid deed, given for a good and sufficient consideration, and denies the material allegations of the bill regarding the decedent's physical and mental condition and her incapability of making said deed or of understanding the effect thereof. It also alleges laches on the part of the plaintiff.

The case was referred to a master who made two reports, one upon the matter of cancellation and one upon the matter of accounting. The case comes before this court on appeal by the defendant from an interlocutory decree overruling his exceptions and confirming the reports and from the final decree. The plaintiff has taken no appeal to the final decree, and as to him it must stand. The evidence is not reported and the findings of fact by the master must stand unless clearly wrong.

As found by the master the pertinent material facts are as follows: The premises were bought in 1911 by the defendant Moore in the name of the decedent, with money, part of which was furnished by him and part by two mortgages, one for $3,500 and one for $300. The second mortgage was discharged in 1919, and the money advanced by the defendant was repaid to him by the decedent. At the time of this purchase the defendant also purchased for himself the adjoining premises where he has resided with his wife and children ever since. At the time of the hearing he was about fifty-one years of age and was in fairly comfortable circumstances.

At the time of the hearing the plaintiff was forty-nine years old, and had for several years been connected as a salaried man in the business of making and selling automobiles and accessories. Since 1911, with his wife, daughter and son, he resided with the decedent until her death; furnishing to her board in return for the use of the house, rent free.

"The decedent died on May 30, 1923, at the age of seventy-one years, four months and twenty-one days. According to

the certificate of death . . . the cause of death was cerebral hemorrhage, duration one day, with a contributory cause of arterio sclerosis, duration ten years. The decedent was a teacher in the public schools of Boston for nearly twenty-nine years, during several years of which she had been chief assistant to the head master of the district and had been in charge of the Nathaniel Hawthorne School, teaching in addition to her duties as chief assistant, arithmetic and geography. Her husband died in 1910.

"In 1916 the decedent had a fall whereby her elbow was dislocated and her nose broken. As a result of this, it was very difficult for her to use her arm in writing, combing her hair, dressing herself and going up and down stairs. In 1918 she was obliged to call in her attending physician, Dr. Knudson, for an ailment which the doctor diagnosed as arterio sclerosis or hardening of the arteries and Bright's disease. The disease assumed such proportions that at least as early as 1920 the doctor advised her to give up teaching as tending to aggravate the disease. She, however, continued to teach until the fall of 1921. During the school year from September, 1920, to June, 1921, inclusive, a great deal of the manual part of her teaching, such as making reports, writing on the blackboard and keeping records, was done for her by her assistant teachers. During this period and for the remainder of her life, she had to have assistance in conveying her food to her mouth because of her physical ailments.

"In August, 1921, she had an attack of dizziness and a slight shock, causing her to fall on the stairs of her home. At this time she was laid up for one or two weeks. During this attack, she had some hallucinations, claiming that people were poisoning her and that her casket was in the attic. These hallucinations did not continue, but as a result of the shock her mouth was thereafter drawn down on one side. At the opening of the school year in 1921, she decided to give up teaching, but returned to school for the purpose of organizing it and getting it going, and remained there until November 1, 1921. She hoped that on her retirement, she would receive the full pension of half pay, but discovering

that in order to do this she would have to serve another full year after that school year, she accepted a three months leave of absence with full pay and a pension thereafter of $45.10 a month. At the time of her retirement she was receiving $191 a month salary.

"On November 1, 1921, when the decedent retired from teaching, the . . . [plaintiff] was receiving $15 a week salary. He had not been very successful in business and had held several positions. His wife had helped out somewhat by doing dressmaking at home. In consequence of the decedent's retirement from teaching, the . . . wife, in November, 1921, was obliged to extend her activities as dressmaker by taking steady employment outside the house. Up to that time . . . [she] had taken care of the decedent, but thereafter, on account of her occupation as a dressmaker, she was not able to do so and a housekeeper was employed by the . . . [plaintiff].

"The decedent was under the doctor's care from 1918 until the time of her death. After she gave up teaching, she was practically confined to the house and gave up all active participation in outside affairs. Her eyes had been affected for some time, and Dr. Knudson had forbidden her to read because of possible aggravation of her disease. She would read the headlines of the newspapers, but for the most part some one read to her. She took occasional walks with an attendant until a short time before her death.

"About February 25, 1922, the decedent had another attack of dizziness, rendering her unconscious for a whole day, from which she did not entirely recover for four days afterwards. A nurse named Miss Butler, with hospital training but not a graduate nurse, was sent by Dr. Knudson to take care of the decedent, and she stayed until May 30, 1922. From that time until the day of her death, the decedent was under the constant care of a succession of nurses. During the attack of February 25, 1922, she was very weak and somewhat delirious. Her temperature on that date was one hundred and one.

"About two or three days before March 10, 1922, William J. Drew, Esquire, an attorney at law of high standing and

integrity, living in the vicinity, . . . was instructed by the
. . . [defendant] to draw a quitclaim deed of the premises
numbered 36 Richwood Street from the decedent to the . . .
[defendant], subject to the mortgage held by the Roxbury
Co-operative Bank.   Mr. Drew had never acted as attorney
for the . . . [defendant] before . . . .   [He] examined the
records at the registry of deeds for the purpose of getting a
description of the property and drew the deed on March 9,
1922.   He was instructed by the . . . [defendant] to go to
36 Richwood Street on March 10, 1922, on his way to his law
office.   He accordingly arrived there about 8 A.M. and went
to the decedent's bedroom . . . .   [The nurse and doctor],
the latter having been summoned by the . . . [defendant's]
wife, were there.   The . . . [plaintiff] and his wife had left
the house for their respective employments and . . . [their]
daughter . . . and . . . son . . . were in the house but not
in the room at the time of the execution of the deed.   Mr.
Drew said to the decedent, 'Arthur told me you wanted to
give this house to him;' the decedent said, 'Yes, I did.'   Mr.
Drew said, 'I have prepared a deed which I have here and I
want you to look at it.'   Then he passed it to her and she,
according to Mr. Drew's testimony, apparently read it.   She
then asked where she was to sign and Mr. Drew told her to
sign opposite the seal.   Previous to her signing, Mr. Drew
had written at the left of the place reserved for her signature,
the words 'Witness to signature.'   The doctor and nurse
started to go out of the room but Mr. Drew asked them to
wait as he wanted them to be there when the deed was signed.
The decedent then signed the deed and Dr. Knudson and
Miss Butler signed as witnesses thereto.   The decedent then
acknowledged the instrument to be her free act and deed
before Mr. Drew, as justice of the peace.   Mr. Drew then
said to the decedent that he would take the deed out and
record it and she said 'That is right, that is what I want you
to do.'   Mr. Drew then left the house with the deed and had
it recorded in the Suffolk registry of deeds the same day at
10:07 A.M.

"I find that at the time of the execution of the deed, the
only resources of the decedent were the said No. 36 Richwood

Street, $924.36 in cash, and the pension of $45.10 a month. She had a nurse in constant attendance at a cost of about $28 a week and she also needed medical attendance.    There was a mortgage on the premises held by the Roxbury Co-operative Bank, on which $484 was unpaid.    The decedent also, presumably, would be under some expense for cloth-ing and medicine.    I find that no consideration was paid her for the deed.    I find that the decedent was always particularly fond of her grandchild, Betty, the . . . [plain-tiff's] daughter, and had always taken upon herself to a large degree the duty of providing . . . [her] with clothing and other necessaries.    I find the decedent had at different times prior to the execution of the deed, stated that she intended to keep the house so that Betty could have a home, and that each of her two sons could have an equal share in it.    I find that she was a woman who was reticent and independent about her affairs and looked forward with considerable ap-prehension to the diminution of her income in consequence of her giving up teaching, that she said some time before the execution of the deed that she was afraid she would have to mortgage the property in order to pay expenses, and that she stated after the execution of the deed that she had been obliged to mortgage the premises for the same purpose."

The history of the relations of the parties, and more par-ticularly the findings of the master that "the . . . [defend-ant] had looked after the financial affairs of the decedent"; that she "relied upon the . . . [defendant] as her financial advisor"; that after "she ceased teaching, the money came to her in the form of checks, which were regularly indorsed and turned over to the . . . [defendant]"; that "At the time of the execution of the deed [on March 10, 1922], the . . . [defendant] had in his possession $924.36 of the decedent's money"; that on "July 11, 1921, she had given him $411.30 which she had drawn from the co-operative bank"; that "At the time of the decedent's death [on May 30, 1923] the . . . [defendant] had no money of hers"; and that "she left no estate except a pension check for $45.10, due for the month of May, 1923," warrant the conclusion that the de-fendant stood in the highest degree of confidential relation-ship to the decedent.

The finding that "at the time of the execution of the deed, the decedent was not insane and was mentally competent to execute such an instrument," taken with the further finding that she "was able to understand the nature of the instrument if it was explained to her . . . that the legal effect of the instrument was not explained to her and the evidence does not sufficiently disclose that she actually read it," is entirely consistent with the finding based on all facts found, that "it [is] an unreasonable conclusion . . . that she conveyed away such a substantial part of her property without consideration and with no condition attached thereto, knowing, as she must have known, that her remaining resources would not be enough to pay her expenses, and that she was also depriving the . . . plaintiff, his wife, daughter and son, of a much needed home."

In contradiction of the defendant's explanation regarding the deed that "two or three days before its execution his mother told him, no one else being present, that she had decided to give him the property, whereupon he said, 'Very well, I will get Mr. Drew to draw the deed,'" the master found on all the facts that, while the decedent was not insane or mentally incompetent, her mind was not sufficiently alert, owing to her illness, to grasp the legal effect of the deed unless the same was explained to her; that she did not intend to convey said property outright to the defendant, but did intend to arrange for the raising of money thereon; that the details whereby this was to be accomplished did not occupy her attention; that she did not understand at the time of the execution of the deed that she was giving the whole property away without condition and without consideration; that the defendant knew his mother's state of health and her financial situation, and had reason to know that she understood the object of the transfer to him was the obtaining of a mortgage on her property for her support, and that she did not intend to convey the equity outright.

The assertion by the defendant (found by the master to be false), that the decedent gave him the property, the existence of confidential relations between him and the decedent, his failure to make sure the decedent understood the legal

effect of her deed to him, the unusual ceremonies attending the execution of the deed, together with the fact that on August 7, 1922, the defendant mortgaged the property for $3,000 and with the money thus obtained purchased six per cent bonds in his own name, deposited the balance to his own account, and paid nothing of it to the use of the decedent, justified the finding of the master and his conclusion of fact that the acts of the defendant were in fraud of the rights of the decedent.

It is plain the defendant as the financial agent of the decedent was bound to account to his principal for the estate conveyed and for the uses of it, whether the estate was retained by him, mortgaged or sold. Since the bill was filed the premises have been sold for $9,500, out of which the mortgage of $3,000 has been paid and the sum of $5,000 deposited in court to await the disposition of the suit. We find no error in the account as stated by the master and confirmed by the court.

*Decrees affirmed.*